# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| SAMUEL SAXON | ) | Case No. 1:25-mj-975 |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date(s) of **December 6, 2025,** in the county of **Hamilton** in the **Southern** District of **Ohio**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1001(a)(2) | False Statement or Representation to an Agency of the United States |

This criminal complaint is based on these facts:

See attached affidavit of DHS OIG Special Agent Cassandra Weitzel

☑ Continued on the attached sheet.

*Cassandra A. Weitzel*
*Complainant's signature*

Cassandra Weitzel, Special Agent, DHS OIG
*Printed name and title*

Sworn to before me and signed in my presence.
via FaceTime video

Date: **Dec 10, 2025**

Karen L. Litkovitz
United States Magistrate Judge

City and state: Cincinnati, Ohio

**AFFIDAVIT IN SUPPORT OF**
**A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Cassandra Weitzel, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of a criminal complaint and arrest warrant for SAMUEL SAXON for a violation of 18 U.S.C. § 1001(a)(2) (False Statement or Representation to an Agency of the United States).

2. I am a Special Agent with the Department of Homeland Security (DHS), Office of Inspector General (OIG), and have been so employed since February 2009. The DHS OIG is the lead Internal Affairs component of the DHS. The duties of the DHS OIG include the investigation of fraud, waste, abuse, and other criminal misconduct involving DHS programs, personnel, and funds. Most investigations involve public corruption, employee criminal misconduct, and/or issues that affect the programs and operations of the DHS.

3. The facts in this affidavit come from my personal observations, my training and experience, reports and other evidence I have reviewed, and information obtained from other government agencies and witnesses. When I describe something a witness or report said, I do so in sum and substance and in relevant part. This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and arrest warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that SAMUEL SAXON has violated 18 U.S.C. § 1001(a)(2) (False Statement or Representation to an Agency of the United States).

## RELEVANT STATUTE

5. To prove a violation of 18 U.S.C. § 1001(a)(2), the United States must show:

    a. First, that the defendant made a statement or representation;

    b. Second, that the statement was false, fictitious, or fraudulent;

    c. Third, that the statement or representation was material;

    d. Fourth, that the defendant acted knowingly and willfully; and

    e. Fifth, that the statement or representation pertained to a matter within the jurisdiction of the executive branch of the United States government.

## PROBABLE CAUSE

A. Introduction

6. Since approximately mid-2024, SAMUEL SAXON has served as Assistant Field Office Director for the Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) Cincinnati Sub Office.

7. On December 5, 2025, a resident of the apartment building where SAXON lives called 911 and reported that he/she had just seen a man putting a woman in a chokehold in the hallway of the apartment building and then had heard a physical assault after the man dragged the woman into an apartment later determined to be SAXON's. Officers from the Cincinnati Police Department (CPD) responded to the apartment building, where they found the woman, later determined to be SAXON's girlfriend (hereafter, the "Victim"), with visible bruising on her neck. CPD signed felony charges on SAXON for Felonious Assault and Strangulation, and he was arrested at a hotel later that evening, at around 1:00 a.m. on December 6, 2025.

8. About an hour after SAXON's arrest, a CPD officer and I conducted a Mirandized interview of him. During that interview, SAXON repeatedly lied about issues of material

2

importance to the DHS OIG's investigation, including about whether he had interacted with the Victim in person at around the time the neighbor called 911, or at any time that day. As I describe in more detail below, whether or not SAXON was present at the scene of a felonious assault and strangling to which police responded, and whether he committed the felonious assault and strangling with which he was charged, are questions material to the DHS OIG's investigation for many reasons, including because my duties include investigating whether a DHS employee has committed a crime and preparing a report to ICE regarding whether one of its employees has engaged in criminal misconduct.

F. **On December 5, 2025, a witness reported seeing a man dragging a woman down the hallway in a chokehold and into an apartment later identified as SAXON's, where the witness then heard the man assault her.**

9. On December 5, 2025, at about 3:00 p.m., a 911 caller reported seeing a physical altercation between a man and a woman in the hallway of the apartment building where SAXON lives. On the 911 call and in a later written statement, the witness said the man was "dragging [the woman] down the hallway in [a] chokehold" and that he was "screaming at her asking where 'the check' was." The witness reported that the man "continued to scream at [the woman] and jerked her around." According to the witness, the man then dragged the woman into an apartment (later identified as SAXON's), at which point the witness "heard him screaming at [the woman], and then . . . heard him slap her and she screamed."

10. The witness later gave responding officers three short videos his/her roommate had taken in the hallway outside SAXON's apartment shortly after seeing SAXON take the Victim inside. I have reviewed these videos, and they appear to capture the sound of an aggressive argument between SAXON and the Victim. Although not all of their words can be made out, SAXON can be heard yelling, among other things, "Get up," "Bitch," and "Fuck you!

3

Fuck you!"; the Victim seems to be screaming in fear. Other sounds consistent with a physical altercation can also be heard.

  **G. Officers who responded to the scene that evening saw bruising on the Victim's neck.**

  11. Shortly after the 911 call on December 5, 2025, CPD officers responded to SAXON's apartment complex, where they encountered the Victim. She did not wish to make a statement; however, officers saw bruising on her neck, consistent with her having been strangled.

  12. Based on my training and experience, I know that victims of domestic abuse commonly refuse to cooperate with law enforcement and even lie about what happened to them. The reasons victims do so are varied, but common reasons are that the victim lives with the perpetrator and has nowhere else to go, and because the victim is afraid that the perpetrator will retaliate against them for reporting the incident to police. Additionally, in my training and experience, when (as here) the perpetrator is a member of law enforcement, the victim commonly has an increased fear of retaliation and is more likely not to report incidents, or to refuse to cooperate with law enforcement, because of their abuser's authority.

  **H. After his arrest a few hours later, SAXON said he had not physically interacted with the Victim that day and had only communicated with her over the phone.**

  13. Later that evening, at around 1:00 a.m. on December 6, 2025, SAXON was arrested at a hotel on felony charges of Felonious Assault and Strangulation.

  14. About an hour later, a CPD officer and I conducted a recorded interview of SAXON. I informed him that I was a special agent with the DHS OIG, and I read him his Miranda rights, which he waived in writing.

  15. Upon questioning, SAXON said, among other things, that the Victim was his ex-girlfriend and that they had dated for about five years. SAXON said that, earlier that day, in

the afternoon, he had stopped by his apartment to slip a check under the door for the Victim.[1] SAXON claimed he had given the Victim a cashier's check and was paying her to move out so he could go on with his life.

16. Later, the following exchange occurred in which SAXON claimed, in sum and substance, that he had not had any conversations with the Victim that day except over the phone, and that, if neighbors had heard yelling, that must have been the Victim screaming at him over the phone:

| | |
|---|---|
| Special Agent: | So, CPD received complaints today that you and [the Victim] had an argument at the apartment. |
| SAXON: | Okay. |
| Special Agent: | And so, and you know this. I do have to tell you, but you know this. You're a federal officer; I'm a federal officer. Anything you say, be truthful, because lying to me -- just lying to me is a crime in itself. I don't think you're going to be untruthful. You know how it goes. I have to advise you of that, and you know that already. But, so, there were complaints that they heard an argument. And you know there's cameras at the apartment -- |
| SAXON: | Yeah, sure. |
| Special Agent: | So, let's just go back for a second. So, did you have any conversations with [the Victim]? |

---

[1] Note that this corroborates the 911 caller's statement that the man and woman he/she had seen had been arguing about a "check."

5

| | |
|---|---|
| SAXON: | **[The Victim]? No, I'm texting, I'm texting through the -- over the phone.** |
| Special Agent: | Okay. Well, neighbors wouldn't complain about you texting over the phone. |
| SAXON: | **Yeah, no, no, but if she's in there screaming at me over the phone.** |
| Special Agent: | Okay. |
| SAXON: | **[Laughs] So, yeah.** |

17. Later, I told SAXON that I did not think he was being completely honest with me. The following exchange then occurred, in which SAXON again said that he had not argued with the Victim that day in person:

| | |
|---|---|
| Special Agent: | Okay, Sam, I don't think you're being completely honest with me. |
| SAXON: | Okay. All right. |
| Special Agent: | About today. I think that we've talked to a couple different neighbors who said they saw you arguing, and they saw you in the hallway arguing. So I want you to really think hard about arguing with [the Victim] today. |
| SAXON: | **Yeah. No. No, I mean -- I was in the garage -- I'm getting my days confused. I was in the garage for quite a bit today, yeah. Just sitting there**. |

18. Later in the interview, SAXON again claimed that he had not interacted with the Victim in person and had only spoken to her over the phone that day:

6

| | |
|---|---|
| CPD Officer: | Do you want to hear the accusation that we got today? |
| SAXON: | That's fine. I mean, I imagine -- now that you're telling me all this, it's not about the dude at the Mexican place, so [laughs] -- |
| CPD Officer: | We got called for neighbors seeing a man choking a female -- |
| SAXON: | Oh, gosh. |
| CPD Officer: | And dragging her into the apartment. Eye independent [sic] witnesses. Multiple. Saying -- and then when we got there we talked to [the Victim] and she had bruises around her neck. |
| SAXON: | Oh, gosh. |
| CPD Officer: | So, do you know how that happened? |
| SAXON: | No. |
| CPD Officer: | **You never had any physical react-, interaction with her today?** |
| SAXON: | **With [the Victim]? No. On the telephone, yeah.** |
| CPD Officer: | **Nothing on the telephone?** |
| SAXON: | **No, just on, just on the phone**. |
| CPD Officer: | **Just on the phone?** |
| SAXON: | **Yeah.** |

19. Based on the evidence I described above—including the statement from an eyewitness who said he/she saw a man drag a woman into SAXON's apartment and then heard

7

them fighting inside, the videos from the eyewitness's roommate capturing the sound of a loud, verbal altercation between SAXON and the Victim inside SAXON's apartment, and the bruising officers saw on the Victim's neck that night—I respectfully submit that there is probable cause to believe that SAXON was lying when he said, in sum and substance, that he had not had any physical interaction with the Victim on the day of the 911 call described above and had only spoken with her via phone.

20. I further submit that SAXON's lie was relevant and material to an ongoing investigation by the DHS OIG. As noted, my agency is tasked with investigating, among other things, potential criminal conduct by DHS employees, which includes ICE employees. My duties and responsibilities include determining whether ICE employees have committed crimes, determining whether to recommend criminal prosecution of ICE employees, and reporting to ICE Chief Counsel, through ICE management, about evidence of criminal conduct by employees so that, among other things, the agency can make determinations about whether an employee should be terminated from his position. Even if I determine that the evidence is insufficient to prove beyond a reasonable doubt that an employee has committed a crime, if my investigation reveals evidence of criminal conduct and/or a pattern of dishonesty by the employee, that is something that I would include in my report so the agency can make a determination as to whether to move forward with an administrative action, such as terminating that employee's employment.

21. In this case, whether SAXON committed the acts of violence for which he has been criminally charged is directly relevant to my inquiry into whether ICE should take administrative action against him. Had SAXON told the truth—that he was present at his apartment on December 5, 2025, and that he argued with and physically harmed the Victim—

8

that information would have helped my investigation by further corroborating the evidence I have already obtained. It would have been particularly useful because, as described above, the Victim has not been cooperative with law enforcement. Because he lied, however, I will now seek additional sources of evidence to prove his responsibility for the offense.

## CONCLUSION

22. Based on the foregoing, I request that the Court issue the proposed criminal complaint and arrest warrant.

Respectfully submitted,

*Cassandra A. Weitzel*
CASSANDRA WEITZEL
SPECIAL AGENT
DHS OIG

Subscribed and sworn to before me via FaceTime videoconference in accordance with Fed. R. Crim. P. 4.1 on December 10, 2025.

*Karen L. Litkovitz*
Karen L. Litkovitz
United States Magistrate Judge

9