**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Case No. 1:24CR058 |
| vs. | : | |
| SAMUEL SAXON, | : | Judge McFarland |
| Defendant. | : | |

**SENTENCING MEMORANDUM OF SAMUEL SAXON**

As a young boy growing up in rural Ohio, Sam always dreamed of becoming an officer. School didn't interest him much, but he loved sports and anything that allowed him to explore the great outdoors. With two working parents, Sam learned the value of contributing to a team at a very early age. And as the middle child of three boys, he relished the camaraderie of their brotherhood. It should come as no surprise that these characteristics transferred well when Sam became a federal agent with Immigrations Customs and Enforcement (ICE).

At the age of 27, after graduating from college and obtaining his master's degree in justice studies, Sam enrolled in basic training. Wanting to make his family proud, he devoted himself to his studies and earned awards in academics, driving, and fitness. Of all these early achievements, Sam felt most proud of the skills he acquired as an "expert" marksman. He rose to the top of his class and earned a certificate for achieving the highest score.

Sam is 47-years old now and will stand before this Court to be sentenced on October 20, 2026. On April 1, 2026, Sam accepted responsibility for making a false statement to a federal agent. Specifically, he told an agent during an unconventional interview that he did not see D.A.

in person on December 5, 2025. That statement, as it turns out, was material to an investigation he knew nothing about.

Unbeknownst to Sam, the agency that he had worked tirelessly for over the last 20 years was investigating him for allegations of domestic violence and timekeeping and attendance fraud. When Sam later learned about the nature of those charges, he was crushed, by his own error in judgment and by the knowledge of what the consequences of his failures would mean for the career and life he had built for himself. Sam's devotion to serving the Southern District of Ohio—and to carrying out the President's immigration enforcement priorities—was more than just a job; it was a calling.

Sam recognizes the seriousness of making a false statement to a federal agent because he was a federal agent. He is not proud of his choices and does not seek to excuse his conduct. He does, however, seek a reasonable sentence, one that is grounded in the applicable guideline range and accounts for his mitigating history and characteristics, his decades of honorable service, his remorse, and the need to avoid unwarranted sentencing disparity.

18 U.S.C. § 3553(a) has been described as a "tapestry of factors, through which runs the thread of an overarching principle." *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008). The Court is tasked with imposing a sentence that is "sufficient but not greater than necessary." For the reasons supplied herein, the defense submits that a term of imprisonment of 12 months and 1 day strikes that appropriate balance.

**Samuel Saxon's History and Characteristics and the Nature of the Offense.**

On December 6, 2025, following his arrest for state charges, Sam was interviewed by a Cincinnati Police Department officer and an agent from the Department of Homeland Security (DHS) Office of Inspector General (OIG). During the interview, law enforcement asked Sam if he

had seen D.A. in person. Sam denied any face-to-face interaction, knowing that this statement was false. (PSR, ¶¶14-15). As a former federal agent, Sam understands the difficulties that arise when a suspect lies during an interview. Crediting his version of events could have certainly hindered DHS OIG's ongoing investigation. However, at the time of his arrest, immigration authorities had already established two working theories of culpability. *See* (PSR, ¶¶37-43). Thus, Sam's statement, while illegal, did not hinder or affect his prosecution; and this fact serves to mitigate the nature and circumstances of the offense.

Outside of this temporary lapse in judgment, Sam was otherwise a devoted and hardworking agent, who took his oath to serve this country very seriously. Throughout his tenure with ICE, Sam earned over 22 commendations and awards, not to mention two promotions: to Unit Chief and Assistant Field Office Director. Like in his childhood, Sam loved the camaraderie of having brother officers. There wasn't a mission above his pay grade, or a job he wasn't willing to do.

In addition to being recognized for his exceptional conduct and hard work within his various units, Sam also stood out to his superiors in the agency. In 2016, Secretary of Homeland Security Jeh Johnson and Deputy Secretary of Homeland Security Alejandro Mayorkas presented Sam (and a number of his colleagues in the Ice Criminal Alien Program) with the Secretary's Meritorious Service Medal. The award sought to recognize exceptional individual leadership or service that was distinguished by achievements of marked significance over time in the Department of Homeland Security. This award was just one of many honors Sam received throughout his career.

*See* (Sam Saxon, pictured below, in the middle of the group with the red tie and glasses).

## Secretary's 2016 Meritorious Service Silver Medal Presented To The Ice Criminal Alien Program



While Sam is certainly proud of his years of service, his awards, and his many accomplishments, Sam was never motivated by external recognition or validation. Instead, he was motivated by helping people and protecting communities. Part and parcel of public safety considerations, Sam was motivated by a desire to create a better workplace for his colleagues. As a supervisor, Sam fostered an environment that was both understanding and supportive. He watched out for his people and made sure that no one was treated unfairly.

As part of the underlying investigation, many of Sam's colleagues were interviewed. Repeatedly, Sam was described as a boss who maintained "good professional relationship[s];" he

was someone his staff could talk to and "bounce[] ideas off" of; and he was easy to reach and always available.[1] If someone called and needed Sam, he answered.

Sam's professional success is now eclipsed by the struggles he faced in his personal life. As detailed in the PSR, Sam was involved in a toxic relationship with D.A. for several years. While Sam struggled with his own demons, D.A. also struggled with hers. Unfortunately, despite years of trying to sort out their differences, the relationship became untenable and destructive for both Sam and D.A.

The government devotes much of its sentencing memorandum to the underlying allegations of domestic violence and abuse, which are unadjudicated charges still pending in the Hamilton County Court of Common Pleas. (PSR, ¶50). This Court is not tasked with evaluating the veracity of those charges or the toxicity of that relationship, and, as set forth in the presentence report, the guideline range already accounts for the alleged domestic violence in its application of the cross reference and its assessment of an additional 4-level enhancement. (PSR, ¶¶23-26). Beyond this calculation, due process and the fair administration of justice require that Mr. Saxon be given the opportunity to address those charges in the court and jurisdiction in which they were brought.

In this case, the Court is tasked with sentencing Mr. Saxon for the false statements he made when he was questioned by a federal agent – nothing more and nothing less.

**<u>The Advisory Guideline Range.</u>**

Under the advisory sentencing guidelines range, Mr. Saxon faces a term of imprisonment of 15 to 21 months, based on a total offense level of 14 and a criminal history category of I. (PSR, ¶¶36, 47). While probation assessed a two-level reduction for acceptance of responsibility, it did not award the third level because the government had yet to move for it. (PSR, ¶35). But Mr. Saxon

[1] In advance of sentencing (over the last week), the government provided 14 interviews conducted with Mr. Saxon's former colleagues at ICE. This statement comes from excerpts from three of those interviews.

is entitled to that additional point because any preparation for trial that the government engaged in was a result of its choices, not his.

As the Court will recall, both parties engaged in significant trial preparation, as a plea offer was not extended to Mr. Saxon until the eve of trial. In the absence of a plea offer and given the government's assertion that it would seek the statutory maximum sentence regardless of Mr. Saxon's choices, defense counsel could not advise Mr. Saxon about the benefits and dangers of waiving his rights under the Speedy Trial Act. This difficulty was further compounded by the government's decision not to disclose information regarding its pending investigation into time and attendance fraud. Critically, as relates to the additional acceptance point, both parties ceased trial preparation as soon as the government informed defense counsel about the nature of the investigation, and provided a proposed written plea agreement for Mr. Saxon to consider.

Regardless of whether the government moves for the third point off for acceptance of responsibility, the Court can and should credit Mr. Saxon with "timely acceptance." By using a one-level downward variance, Mr. Saxon's total offense level would be 13. When combined with a criminal history category I, his advisory guideline range would be 12 to 18 months. This range is the fair range. Had the government treated Mr. Saxon as it does all other defendants, by extending the plea offer in a timely fashion, not on the eve of trial, the presentence report would reflect a range of 12-18 months. Bearing that calculation in mind, the defense is requesting a within-guideline sentence[2] of 12 months and 1 day imprisonment.

**Need to Avoid Unwarranted Sentence Disparity.**

While the guidelines are an important starting point in any criminal case, they are even more prudent here, given the limited comparable statistics. According to data compiled by the

---

[2] Within guideline sentences are presumptively reasonable when reviewed on appeal. *Rita v. United States*, 551 U.S. 338, 341 (2007).

United States Sentencing Commission Judiciary Sentencing INformation (JSIN), during the last five fiscal years, where the primary guideline was § 2X3.1, there was an insufficient number of defendants with a final offense level of 14 and a criminal history category I. In other words, there are no other cases available for comparison purposes.[3] That said, under § 2J1.2, there were 42 defendants with a final offense level 14 and a criminal history category I. In those cases, both the median and average lengths of imprisonment was 12 months, meaning the requested sentence would not result in an unwarranted sentence disparity.

By contrast, the upward variance that the government seeks would undermine this statutory factor and result in an unwarranted sentence disparity and procedural error. As articulated in *United States v. Brown*, a district court errs when it imposes a sentence that doubles the high end of the guidelines range based on the defendant's prior criminal history. *United States v. Brown*, 828 Fed. Appx. 256 (6th Cir. 2020). In rejecting the district court's approach in *Brown*, the Sixth Circuit recognized that the need to avoid an unwarranted sentence disparity was undermined by an over-reliance on the defendant's criminal history. *See also United States v. Warren*, 771 Fed. Appx. 637 (6th Cir. 2019) (same).

In this case, the government's request for a sentence of 60 months would constitute a 75% upwards variance from the low end of the advisory range. And unlike the defendants in *Brown* and *Warren*, where the district judge utilized their prior criminal histories to aggravate their sentences, the government in this case relies entirely on unadjudicated allegations of criminal conduct. The imposition of an upward variance here is not supported by the relevant caselaw and would result in a manifest injustice.

[3] The same is true if the Court runs the numbers using guideline § 2A6.2.

## Conclusion.

Wherefore, based on the foregoing, and the arguments that will be presented at sentencing, the defense respectfully asks the Court to impose a sentence of 12 months and 1 day imprisonment.

Respectfully submitted,

JOSEPH MEDICI
FEDERAL PUBLIC DEFENDER

*s/ Zenaida R. Lockard*
Zenaida R. Lockard (KY93402)
Karen Savir (KY92002)
Assistant Federal Public Defenders
250 East 5th Street, Suite 350
Cincinnati, Ohio 45202
(513) 929-4834

Attorneys for Defendant
Samuel Saxon

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon Julie Garcia and Ashley Brucato, counsel for the government, via CM/ECF on this 14th day of October 2026.

*s/ Zenaida R. Lockard*
Zenaida R. Lockard